OPINION OF THE COURT
Carol Berkman, J.
*182 The People move for an order disqualifying the Legal Aid Society from representing defendant’s case on the grounds that the Legal Aid Society has previously represented an important prosecution witness. In response, defendant asserts that the People’s motion should be precluded because of its lateness. Alternatively, defendant argues that the prior representation of the prosecution witness in this case does not raise a potential or actual conflict because the Society will not and has not breached the former client’s confidences.
If this case simply involved a matter of cross-examining the prior client as to his criminal convictions,[1] the defendant’s Sixth Amendment right to continue with a lawyer in whom he had developed a relationship of trust would control. But the Legal Aid Society has already suggested to the former client’s co-workers that he is implicated in the crimes with which the defendant is charged. The Legal Aid Society also apparently intends on raising this issue of the witness’ guilt at defendant’s trial. One can imagine no greater instance of disloyalty to a former client — a former client who is still on work-release pursuant to a case in which he was represented by the Legal Aid Society. But even if the choice of whether to present evidence of the witness’ guilt is yet to be made, it should be made by unconflicted counsel. (See, 1989 Opns NY State Bar Assn Comm on Professional Ethics No. 605.)
Balancing the defendant’s vital Sixth Amendment interests against the interests of the former client, the People’s right to a fair trial and the need to maintain the appearance of the propriety and integrity of the justice system, the Legal Aid Society must be disqualified.
FACTS
On January 10, 1997, the defendant was arrested and charged with two gunpoint robberies of a store called the Sweet Factory on October 17 and November 3, 1996. The. Legal Aid Society was assigned to represent the defendant on January 10, 1997, the same day as the arrest. The Legal Aid Society assigned the case to Deborah Weissbard, to be assisted by Kenneth Finkelman.
The People’s witnesses include Mr. Luis Elicier, Ms. Donna Townsend and Ms. Shirley Hernandez-Palermo. According to *183 the People’s theory, Mr. Elicier is an eyewitness and victim of both of the gunpoint robberies. Mr. Elicier himself has a criminal record. Ms. Townsend and Ms. Hernandez-Palermo have made sworn affidavits that, during the summer of 1997, representatives of the Legal Aid Society visited them and referred to Mr. Elicier’s prior conviction for robbing his employer. (Legal Aid did not represent Elicier in this particular case.) Legal Aid lawyers and/or investigators indicated to Ms. Townsend and Ms. Hernandez-Palermo that Mr. Elicier was a suspect in the Sweet Factory robberies. On September 10, 1997, Mr. Finkelman stated to this court that the defense had evidence other than Elicier’s robbery conviction to implicate Mr. Elicier in the Sweet Factory robberies.
On September 3, 1997, the People filed the instant motion for disqualification, alleging that the Legal Aid Society has previously represented Mr. Elicier in criminal cases.[2] The Legal Aid Society had given no indication to the court or to the People of this representation, although, according to the affidavit of Catherine Cook, and not addressed by the defense response, the Society was aware of Elicier’s criminal record by at least early June 1997.
The People have submitted an affidavit from Mr. Elicier in which he specifically asserts that he has not waived any privilege. He states that the Legal Aid Society’s conduct in the course of its investigation has left him feeling apprehensive that confidential information will be used against him by his former attorneys during the course of his cross-examination at *184 trial.[3] In short, he opposes the Society’s continued representation of defendant.
The response does not deny or in any way address the factual allegations as to the conduct of the defense investigation and those allegations must be deemed admitted. The response simply asserts that Ms. Weissbard and Mr. Finkelman became aware of Mr. Elicier’s criminal record and Legal Aid’s prior representation of him through the review of "public records.” Counsel do not state at what point in their investigation they discovered this criminal history, and do not explain why they did not notify the court.
In support of their argument that the prior representation of Mr. Elicier presents no actual or potential conflict of interest, the Legal Aid Society submits an affldavit attesting that "[n]either [Mr. Elicier’s] files nor his attorneys have been consulted in connection with the preparation of the McLaughlin case,” and that nothing that was learned through the course of Legal Aid’s prior representation of him will be used in the course of cross-examination. In addition, the Legal Aid Society asserts that "Mr. McLaughlin has been assured that Mr. Elicier and his other accusers will be vigorously confronted with all relevant information that is available through any lawful means.” (Affidavit in opposition ¶ 14.)
The defense also submits a letter from defendant (exhibit A) in which he states that he wants Ms. Weissbard to continue to represent him because he believes she has worked hard on the case, which he considers a "deep” one and that he "would agree to wave [sic] anything that would prevent her from being my lawyer.” Nowhere does Mr. McLaughlin state that he has been apprised of the potential or actual conflicts in this case, or that he has waived any rights with respect to those conflicts.
DISCUSSION
The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused *185 shall enjoy the right * * * to have the Assistance of Counsel for his defense.” However, the primary aim of the Sixth Amendment is not to guarantee that a defendant will in every case be permitted to retain the particular counsel of his or her choosing: "[W]hile the right to select and be represented by one’s preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.” (Wheat v United States, 486 US 153, 159 [1988].)
Under the circumstances presented here, the Supreme Court has held the Sixth Amendment right to counsel of choice is not unlimited: "The Sixth Amendment right to choose one’s own counsel is circumscribed in several important respects * * * a defendant may not insist on * * * the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government.” (Supra, at 159; see also, United States ex rel. Stewart [Tineo] v Kelly, 870 F2d 854 [2d Cir 1989] [disqualifying defense counsel who had previously represented prosecution witness].)
Thus, the Legal Aid Society’s claim that "it suffices to observe that we are [defendant’s] counsel of choice” is simply not in accordance with the law. Rather, the court must evaluate whether the continued representation of defendant in this case by the Legal Aid Society presents a potential or actual conflict. Moreover, the defendant’s rights and interests are not the only ones at stake. The court must be concerned not only about the defendant, but also about Mr. Elicier, who has expressly refused to waive any rights and attorney /client privileges he may possess, and also about the prosecution’s right to a fair trial.
A conflict of interest exists when an attorney’s current representation is impaired by the loyalty he owes a former client. (United States v Moscony, 927 F2d 742, 749-750 [3d Cir 1991].) Where the primary government witness against a criminal defendant is a former client of defense counsel, there is obviously a potential conflict of interest. (People v Green, 145 AD2d 929, 930 ["(a) conflict of interest exists when defendant’s attorney represents a prosecution witness, even if the representation was on an unrelated charge”]; United States v Locascio, 6 F3d 924, 931 [2d Cir 1993] ["(t)here are many situations in which a * * * court can determine that disqualification of counsel is necessary. The most typical is * * * because of the counsel’s prior representation of a witness or co-defendant”].)
*186 There is no doubt that a conflict exists in this case. Mr. Elicier is a primary witness against the defendant. He claims to be an eyewitness to and victim of the events alleged. His testimony — and his cross-examination by defense counsel — will be crucial. The potential for disclosing confidences, for exhibiting disloyalty to a prior client, and for creating the appearance of impropriety, are dramatically increased by the likelihood that the defense will attempt to implicate Mr. Elicier in the alleged crimes.
The defendant and the Legal Aid Society offer no meaningful response to these problems. Defendant requests that the Legal Aid Society continue to represent him, but it is doubtful that the request constitutes an express waiver of any conflict. Indeed, given the history of this case and the insensitivity of the defense lawyers to the ethics issues involved — amply demonstrated by their failure to inform the court as soon as they learned of the prior representation (see, People v Wandell, 75 NY2d 951, 952 [1990]) — full conflicts advice to this defendant would require the appointment of an independent lawyer for this purpose. In this court’s view, such a step would not resolve the issue. The Supreme Court has noted that courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them * * * Nor does a waiver by the defendant necessarily solve the problem, for we note, without passing judgment on, the apparent willingness of Courts of Appeals to entertain ineffective-assistance claims from defendants who have specifically waived the right to conflict-free counsel.” (Wheat v United States, 486 US 153, 160-162, supra)
Given that the Legal Aid Society’s continued involvement here is untenable, the offer by the Legal Aid Society to maintain a "Chinese Wall” is unavailing. In any event, the requisite showing that a "Chinese Wall” can be maintained has not been made in this case. As a general rule, "[a] lawyer may not both appear for and oppose a client on substantially related matters when the client’s interests are adverse * * * The rule has been extended to provide that if one attorney in a firm is disqualified from representing a client, then all attorneys in the firm are disqualified.” (Solow v Grace & Co., 83 NY2d 303, 306 [1994].) This presumption that the entire firm must be disqualified may be rebutted, but the firm must "demonstrate prima facie that there is no reasonable possibility that any of its other attorneys acquired confidential informa *187 tion concerning the clients * * * [t]he evidence must be sufficient, however, to establish that the former client’s interests are fully protected and to overcome any suggestion of impropriety.” (Solow v Grace & Co., supra, 83 NY2d, at 313.)
In the instant case, the Legal Aid Society has failed to set forth even a prima facie showing rebutting this presumption. Despite the clear language of the Solow decision (supra) and a specific request by the court, the Legal Aid Society has supplied only the most minimal (and very possibly inaccurate) information regarding its prior history of representing Mr. Elicier. The Legal Aid Society has not informed the court which, if any, of its attorneys that have appeared on Mr. Elicier’s behalf are still employed by the Society. Moreover, the court has received no information whether other attorneys at the Society may have had a significant connection to such representation. Particularly here, where Mr. Elicier actually was represented at a felony trial (preceded by a Sandoval motion which must have addressed the prior attempted robbery conviction) by a Legal Aid attorney, it is crucial to know the involvement of supervisory attorneys.
Unlike Solow v Grace (supra), where the attorney at issue had merely handled the preparation of a single expert witness, here Elicier was represented by the Society at a full trial at which he testified in his own behalf. Certainly, trial decisions would have been discussed in the office between the Legal Aid attorney and his colleagues and almost certainly with Legal Aid supervisors. This court has observed that while there may be little communication between the different divisions and different counties of Legal Aid, the same cannot be said of a Criminal Defense Division office of a single county.
Instead, the Legal Aid Society simply asserts that it is virtually exempt from the general conflict rules. In support of this argument, the defendant relies on four cases. In People v Wilkins (28 NY2d 53 [1971]), a Legal Aid attorney discovered for the first time while preparing an appeal that the Society had also represented the complaining witness in an unrelated proceeding. Absent evidence of an actual conflict, the Court of Appeals declined to reverse the conviction. Wilkins, People v Villanueva (181 AD2d 702 [2d Dept 1992]) and People v Liberty (147 AD2d 502 [2d Dept 1989]) involved situations where the Society’s dual representation was unknown at the time of the representation, and where there was absolutely no evidence that any potential conflict had arisen. People v Dakin (199 AD2d 407 [2d Dept 1993]) affirmed a conviction where there *188 was no showing that the alleged conflict affected the conduct of the defense. Nothing in these cases suggests that where the potential conflict is discovered before trial, and indeed during pretrial investigation, a court must not act to protect the rights of the defendant, the previously represented witness, and the integrity of the proceedings before it.
Finally, as to the Legal Aid Society’s argument that the People should be precluded from making this motion because the People have delayed in bringing it, the court notes that the responsibility to raise this issue in the first instance falls squarely on counsel’s shoulders. (People v Wandell, 75 NY2d 951 [1990], supra.) Whether or not the prosecution is culpable for the delay, the conflict infects this entire proceeding and must be eliminated.
Because this court hereby disqualifies the Legal Aid Society from its continued representation in this case, we need not address the People’s alternative argument that Ms. Weissbard be disqualified under the advocate-witness rule.

. Given the potential that allowing inquiry as to the underlying facts of the witness’ prior convictions would permit an inference that he has a propensity to commit the crimes charged in this case, it is likely that no lawyer would be permitted to cross-examine beyond the mere fact of the convictions for the specified crimes.

. At this court’s behest, on September 11, 1997, the Legal Aid Society provided a list of those cases on which it has represented Mr. Elicier in the past and the names of the particular attorneys assigned to represent Mr. Elicier. However, despite this court’s explicit direction, there is no specification as to whether these attorneys are still employed by the Legal Aid Society, nor has the court been advised whether or not other attorneys (such as supervisors) were significantly involved in the representation.
Elicier was arrested on June 22, 1992, for burglary in the second degree and convicted after trial on April 1, 1993. He was sentenced to a 5-to-10-year term of imprisonment. His attorney was Mark Martin. Court records indicate that the Legal Aid Society also represented Elicier on appeal from this conviction, for which Elicier is now on work-release.
An examination of the September 11, 1997 affidavit shows various anomalies (such as arrests when Elicier was apparently incarcerated and a nonpredicate sentence for a felony subsequent to Elicier’s first felony conviction in 1989 in New York County). Thus, the affidavit may or may not be accurate in stating that the Legal Aid Society represented Elicier between April 1997 and July 1997 on a minor misdemeanor matter.

. Specifically, Mr. Elicier states that members of his immediate family have been contacted several times by telephone by Ms. Weissbard, and that she came to his family’s apartment to ascertain his whereabouts. In addition, Mr. Finkelman came to the apartment to inquire about him, made reference to his past robbery conviction (on which Legal Aid did not represent Mr. Elicier) and revealed the name of that victim. Mr. Elicier claims that Mr. Finkelman later told him, in substance, "that I should understand his position and tactics because I have been on both sides of the law. He told me that he knew that I was currently on work release and of my continued improvement thereon.” (Elicier affirmation ¶ 6.)